Alex Bourelly (admitted *pro hac vice*)
Andrew George (admitted *pro hac vice*)
Bethany Labrinos (admitted *pro hac vice*)
**Bourelly, George + Brodey PLLC**
1050 30th Street NW
Washington, D.C. 20007
(202) 255-2357
(202) 341-8805
(845) 633-4240
alex.bourelly@bgblawyers.com
andrew.george@bgblawyers.com
bethany.labrinos@bgblawyers.com

Marvin E. Vallejo (SBN 269561)
**Law Office of Marvin E. Vallejo**
3250 Wilshire Blvd.
Suite 1110
Los Angeles, CA 90010
(323) 947-8490
marvine.vallejo@gmail.com

*Attorneys for Defendant*
*Hossam Hemdan*

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>HOSSAM HEMDAN, et al.,<br>Defendants. | CASE NO. 2:24-CR-00071<br>**DEFENDANT HOSSAM HEMDAN'S MOTION TO DISMISS COUNTS ONE AND TWO OF THE INDICTMENT**<br>DATE: September 3, 2026<br>TIME: 9:00 a.m.<br>COURT: Hon. Daniel J. Calabretta |

By and through his attorneys, Defendant Hossam Hemdan moves to dismiss Counts One and Two of the Indictment against him with prejudice, under Federal Rules of Criminal Procedure 12(b)(3)(A)(i) and 12(b)(3)(B)(v), for the reasons set forth the in the accompanying memorandum of law. Per the Court's order at Docket 162, Mr. Hemdan notices this motion to be heard at the status conference set for September 3, 2026.

Dated: July 16, 2026

Respectfully Submitted,

*/s/ Alex Bourelly*
Alex Bourelly (admitted *pro hac vice*)
Andrew George (admitted *pro hac vice*)
Bethany Labrinos (admitted *pro hac vice*)
**Bourelly, George + Brodey PLLC**
1050 30th Street NW
Washington, D.C. 20007
(202) 255-2357
(202) 341-8805
(845) 633-4240
alex.bourelly@bgblawyers.com
andrew.george@bgblawyers.com
bethany.labrinos@bgblawyers.com

Marvin E. Vallejo (SBN 269561)
**Law Office of Marvin E. Vallejo**
3250 Wilshire Blvd.
Suite 1110
Los Angeles, CA 90010
(323) 947-8490
marvine.vallejo@gmail.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HOSSAM HEMDAN, JAVIER SALGUERO, YEHIA HARB, OSCAR GOMEZ, GUILLERMO TOVAR, ARWA HARB, NAS MESHAL, KHALED HAMDAN, MINH TRUONG, THONG TRUONG, JEREMY EARLS, and MICHAEL NGUYEN,<br><br>Defendants | Case No. 2:24-cr-0071-DJC |

**DEFENDANT HOSSAM HEMDAN'S MEMORANDUM IN SUPPORT OF HIS MOTION TO DISMISS COUNTS ONE AND TWO OF THE INDICTMENT**

## TABLE OF CONTENTS


**INTRODUCTION** ..... 1

**BACKGROUND** ..... 1

I. Legislative Background ..... 1

II. Factual Background ..... 4

**STANDARD OF REVIEW** ..... 5

**ARGUMENT** ..... 5

I. SIP violations are only criminally enforceable under Section 7413(c)(1). ..... 5

A. Statutory Text ..... 7

B. Structure ..... 10

C. Legislative History ..... 11

II. The indictment also fails to identify any "notice, application, record, report, plan, or other document required pursuant to this chapter to be either filed or maintained." ..... 12

III. The government's legal theory violates Mr. Hemdan's due process right to fair notice and the rule of lenity. ..... 17

IV. Because the conduct alleged does not constitute a violation of any federal statute, the conspiracy charge must also be dismissed. ..... 23

V. Count II must be dismissed for improper venue under *Abouammo*. ..... 23

**CONCLUSION** ..... 25

## TABLE OF AUTHORITIES

### Cases

*Abouammo v. United States*,
146 S. Ct. 1571 (2026) .................................................................. 1, 23, 24, 25

*Adamo Wrecking Co. v. United States*,
434 U.S. 275 (1978)........................................................................................ 6

*Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*,
597 U.S. 424 (2022) ................................................................................. 8, 16

Bethlehem Steel Corp. v. Gorsuch,
742 F.2d 1028 (7th Cir. 1984) ........................................................................ 8

*Bittner v. United States*,
598 U.S. 85 (2023) ........................................................................................ 19

*Commonwealth of Virginia v. EPA*,
108 F.3d 1397 (D.C. Cir. 1997) ...................................................................... 8

*D. Ginsberg & Sons, Inc. v. Popkin*,
285 U.S. 204 (1932) ...................................................................................... 10

*Envtl. Def. v. EPA*,
467 F.3d 1329 (D.C. Cir. 2006) .................................................................. 4, 8

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ...................................................................................... 18

*Hancock v. Train*,
426 U.S. 167 (1976) ................................................................................. 9, 14

*Johnson v. United States*,
576 U.S. 591 (2015) ...................................................................................... 17

*Kolender v. Lawson*,
461 U.S. 352 (1983) ...................................................................................... 17

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dep't of Env't Conservation*,
17 F.3d 521 (2d Cir. 1994) ............................................................................ 23

*Mourning v. Fam. Publ'ns Serv., Inc.*,
411 U.S. 356 (1973) ...................................................................................... 17

*Nw. Env't Def. Ctr. v. Owens Corning Corp.*,
434 F. Supp. 2d 957 (D. Or. 2006) ................................................................ 17

*Oklahoma v. EPA*,
605 U.S. 609 (2025) ........................................................................................ 8

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) .......... 9, 10

*Train v. Nat. Res. Def. Council, Inc.*,
421 U.S. 60 (1975) .......... 1

*Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*,
784 F.2d 926 (9th Cir. 1986) .......... 9, 10

*United States v. B & W Inv. Props.*,
38 F.3d 362 (7th Cir. 1994) .......... 7

*United States v. Boren*,
278 F.3d 911 (9th Cir. 2002) .......... 5

*United States v. BP Expl. & Oil Co.*,
167 F. Supp. 2d 1045 (N.D. Ind. 2001) .......... 7, 10

*United States v. Cogswell*,
637 F. Supp. 295 (N.D. Cal. 1985) .......... 23

*United States v. Corona*,
34 F.3d 876 (9th Cir. 1994) .......... 24

*United States v. EME Homer City Generation, L.P.*,
727 F.3d 274 (3d Cir. 2013) .......... 15

*United States v. Gen. Motors Corp.*,
876 F.2d 1060 (1st Cir. 1989) .......... 6

*United States v. Kelly*,
874 F.3d 1037 (9th Cir. 2017) .......... 5

*United States v. Lanier*,
520 U.S. 259 (1997) .......... 19

*United States v. Louisiana-Pacific Corp.*,
908 F. Supp. 835 (D. Colo. 1995) .......... 11

*United States v. Pace*,
314 F.3d 344 (9th Cir. 2002) .......... 24

*United States v. Santos*,
553 U.S. 507 (2008) .......... 19

*United States v. SCM Corp.*,
667 F. Supp. 1110 (D. Md. 1987) .......... 10

*United States v. Trimble*,
487 F.3d 752 (9th Cir. 2007) .......... 18

**U.S. Constitution**

U.S. Const. Art. III, § 2, cl. 3; amend. VI .......... 23

**Statutes**

18 U.S.C. § 371 .......... 4, 23
18 U.S.C. § 1519 .......... 24
18 U.S.C. § 3571 .......... 22
42 U.S.C. § 7405 .......... 7
42 U.S.C. § 7406 .......... 7
42 U.S.C. § 7407 .......... 3, 7
42 U.S.C. § 7410 .......... *passim*
42 U.S.C. § 7411 .......... 2, 7, 19
42 U.S.C. § 7412 .......... 2, 14, 15, 19
42 U.S.C. § 7413 .......... *passim*
42 U.S.C. § 7414 .......... *passim*
42 U.S.C. § 7420 .......... 7
42 U.S.C. § 7429 .......... 8, 14
42 U.S.C. § 7502 .......... 8
42 U.S.C. § 7503 .......... 2, 8
Cal. Code Regs. tit. 16, § 3340.15 .......... 4
Cal. Code Regs. tit. 16, § 3340.17 .......... 4
Cal. Code Regs. tit. 16, § 3340.41 .......... 4

**Regulations**

40 C.F.R. § 19.4 .......... 22
40 C.F.R. § 52.220 .......... 4
40 C.F.R. § 52.241 .......... 4

**Legislative Materials**

H.R. Rep. No. 95-294 (1977) .......... 21

S. 1490, 101st Cong. (1989) .......... 11

**Administrative and Executive Materials**

Exec. Order No. 14,294, 90 Fed. Reg. 20363 (May 9, 2025) .......... 6

EPA's Delegation of Its Authority Under Clean Air Act § 113(b) To Enforce New Source Performance Standards and National Emission Standards for Hazardous Air Pollutants
1988 WL 252387 .......... 14

Kathleen A. Hughes, EPA Memorandum to Regional Criminal Enforcement Counsels re: New Criminal Enforcement Responsibilities Under 1990 Clean Air Act Amendments (Apr. 19, 1993) .......... 1, 17, 20

U.S. Environmental Protection Agency, Enforcement Alert: Aftermarket Defeat Devices and Tampering Are Illegal and Undermine Vehicle Emissions Controls
EPA-300-F-20-001 (2020) .......... 21

U.S. Environmental Protection Agency, Overview of Vehicle Inspection and Maintenance (I/M) Programs
EPA-420-F-21-067 (2021) .......... 3

U.S. Environmental Protection Agency, Section-by-Section Analysis of the Clean Air Act Amendments of 1989 (July 20, 1989) .......... 11, 12

**Secondary Authorities**

Michael S. Alushin, Enforcement of the Clean Air Act Amendments of 1990
21 Envtl. L. 2217 (1991) .......... 21

David P. Currie, The Mobile-Source Provisions of the Clean Air Act,
46 U. Chi. L. Rev. 811 (1979) .......... 20

E. Donald Elliott et al., The Clean Air Act: New Enforcement and Liability Provisions
42 J. Air & Waste Mgmt. Ass'n 1414 (1992) .......... 21

James Miskiewicz & John Rudd, Civil and Criminal Enforcement of the Clean Air Act After the 1990 Amendments
9 Pace Envtl. L. Rev. 281 (1992) .......... 21

## INTRODUCTION

This case was brought under the wrong statute, in the wrong district. Under the Clean Air Act, when a person violates a State Implementation Plan (also known as a "SIP"), EPA must give notice and a 30-day cure period before it can bring charges under the Act's criminal SIP provision, 42 U.S.C. § 7413(c)(1). Here, the government charged Defendant Hossam Hemdan with violating California's SIP by using an OBD simulator to generate false reports. But it did not give Mr. Hemdan notice or an opportunity to cure. Instead, it charged him under 42 U.S.C. § 7413(c)(2)(A)—the Act's general recordkeeping criminal provision, which has no notice or cure requirements. But Section 7413(c)(2)(A) cannot be used to end-run Section 7413(c)(1)'s protections because it does not apply to SIP violations, and because it does not apply to the types of reports at issue here. Likewise, the government's conspiracy charge must also fail because the indictment lacks allegations to support a federal offense. Additionally, Count Two must be dismissed for improper venue under *Abouammo v. United States*, 146 S. Ct. 1571 (2026).

## BACKGROUND

### I. Legislative Background

The Clean Air Act began in 1955 as a modest statute called the "Air Pollution Control Act" that served mostly as a funding mechanism for air pollution research. *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 63 (1975). It has since increased in complexity due to a series of amendments, most notably in 1970 and 1990. Today, EPA acknowledges that "[t]he CAA was, and indisputably remains, the most complex of the environmental statutes administered by the Agency."[1]

---

[1] Kathleen A. Hughes, EPA Memorandum to Regional Criminal Enforcement Counsels re: New Criminal Enforcement Responsibilities Under 1990 Clean Air Act Amendments 1 (April 19, 1993) ("Hughes Memo").

The 1970 amendments organized the Act into several titles. The most comprehensive are Titles I and II, which respectively focus on "stationary sources" and "mobile sources" of emissions.[2] Stationary sources include physical facilities like fossil fuel power plants, incinerators, and blast furnaces.[3] To regulate these sources, Title I establishes programs to monitor and control their emissions;[4] provides a framework for states to develop SIPs to meet the National Ambient Air Quality Standards ("NAAQS") set by EPA;[5] and authorizes EPA to impose performance standards and permitting requirements on owners and operators of stationary sources.[6] Title II, on the other hand, focuses on emissions from "mobile sources," such as motor vehicles, trains, and planes. Among other things, it imposes various requirements on vehicle and engine manufacturers with respect to engine design, fuel content, and maintenance systems.[7]

This divide between stationary sources in Title I and mobile sources in Title II has a notable exception. Title I contains the Act's framework for the development of SIPs, which are required by each state to demonstrate how they will achieve and maintain compliance with NAAQS. Areas that are not meeting NAAQS are designated as "nonattainment" areas and are subject to stricter regulatory requirements. 42 U.S.C. §

---

2 *See United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1183 (6th Cir. 1982), *aff'd*, 464 U.S. 165 (1984); *Weiler v. Chatham Forest Prods., Inc.,* 392 F.3d 532, 534 (2d Cir. 2004).

3 The Act defines "stationary source" as "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3).

4 *E.g.*, 42 U.S.C. §§ 7411 (standards of performance for new stationary sources); 7412 (regulations of hazardous air pollutants).

5 *E.g.*, 42 U.S.C. § 7410 (state implementation plans, which require enforcement of national air quality standards to local stationary sources).

6 *E.g.*, 42 U.S.C. §§ 7414 (recordkeeping, inspections, monitoring, and entry requirements); 7503 (permit requirements).

7 *E.g.*, 42 U.S.C. § 7521 (emission standards for new motor vehicles and new motor vehicle engines).

7407(b), (d)(1)(A). While most of the SIP provisions pertain to stationary sources, the Act requires SIPs for nonattainment areas with high concentrations of ozone or carbon monoxide to adopt a "motor vehicle inspection and maintenance program[]" ("I/M Program"). *See* 42 U.S.C. §§ 7511a, 7512a. As of 2021, few counties across the country have I/M programs.[8]

Title I's enforcement provisions are found in 42 U.S.C. § 7413. For SIP violations, Section 7413(a)(1) provides that, if EPA "finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator *shall notify the person* . . . of such a finding." (emphasis added). After 30 days, EPA may do one of three things: (1) issue an order requiring compliance; (2) issue an administrative penalty; or (3) bring a civil action. 42 U.S.C. § 7413(a)(1).

There is also the possibility of criminal enforcement. Section 7413(c)(1) describes how and when criminal liability is available for a SIP violation. It provides:

> Any person who *knowingly* violates any requirement or prohibition of *an applicable implementation plan* (. . . *more than 30 days after having been notified* under subsection (a)(1) by the Administrator that such person is violating such requirement or prohibition) . . . shall, upon conviction, be punished by a fine pursuant to Title 18 or by imprisonment for not to exceed 5 years, or both.

(emphasis added). In other words, if a person "knowingly" continues to violate a SIP more than 30 days after having been notified, they can be charged with a crime.

Separately, Section 7413(c)(2)(A) also provides a criminal penalty for generally failing to notify or report as required "under this chapter."[9]

---

[8] *See* U.S. Envtl. Prot. Agency, EPA-420-F-21-067, *Overview of Vehicle Inspection and Maintenance (I/M) Programs*, at 2 (2021) (EPA's map demonstrating very few counties with I/M programs).

[9] As relevant here, Section 7413(c)(2)(A) applies to "[a]ny person who knowingly . . . makes any false material statement, representation, or certification in, or omits material information from, or knowingly alters,

## II. Factual Background

On March 21, 2024, the government charged Mr. Hemdan with two counts. Count One alleges conspiracy to violate the Clean Air Act under 18 U.S.C. § 371, and Count Two alleges violations of the Act's recordkeeping and reporting requirements under 42 U.S.C. § 7413(c)(2)(A). The indictment alleges that Mr. Hemdan "designed, manufactured, sold, and utilized . . . smog inspection cheating devices known collectively as OBDNator devices." (Indict. ¶ 3.) These devices would allegedly be plugged into California smog inspection equipment and simulate real vehicles being tested to generate passing reports for noncompliant vehicles in violation of certain provisions of California's smog testing program. (Indict. ¶¶ 3, 21, 25.) The indictment alleges that Mr. Hemdan's conduct occurred in Hawthorne, California, and that the allegedly falsified "reports" were automatically transmitted to BAR's servers in Rancho Cordova. (Indict. ¶¶ 17, 25.)

California's smog testing program requires that "[v]ehicle data and test results from the OBD Inspection System (OIS) shall be transmitted to the bureau's centralized database." Cal. Code Regs. tit. 16, § 3340.17(c). Based on this data, according to the indictment, BAR generates a Smog Check Vehicle Inspection Report, a copy of which is provided to the vehicle owner and maintained by the smog testing facility for three years. (Indict. ¶¶ 16–19 (citing Cal. Code Regs. tit. 16, § 3340.15)). These regulations are components of California's SIP's I/M program.[10] 40 C.F.R. §§ 52.220(c)(372), 52.241.

---

conceals, or fails to file or maintain any notice, application, record, report, plan, or other document required pursuant to this chapter to be either filed or maintained (whether with respect to the requirements imposed by the Administrator or by a State) . . . ."

[10] As the indictment notes, as of October 2022, California outlawed the presence of OBD simulators from the testing area. (Indict. ¶ 22 (citing Cal. Code Regs. tit. 16, § 3340.41(h)).) However, this revision to California's I/M program has not been approved by EPA as part of California's SIP and therefore is not federally enforceable at all, let alone criminally. *E.g., Envtl. Def. v. EPA*, 467 F.3d 1329, 1331 (D.C. Cir. 2006) ("Though created by the states, SIPs do not take effect until approved by EPA."); *Env't Comm. of Fla. Elec. Power Coordinating Grp., Inc. v. Env't Prot. Agency*, 94 F.4th 77, 84 (D.C. Cir. 2024) ("Before a

The indictment does not allege that the government provided the mandatory notice required by 42 U.S.C. § 7413(a)(1), or that Mr. Hemdan's conduct persisted for more than 30 days after receiving notice. Instead, it alleges violations of 42 U.S.C. § 7413(c)(2)(A), Title I's recordkeeping/reporting provision, which does not include the same prerequisites.

## STANDARD OF REVIEW

An indictment may be dismissed if improper venue or failure to state an offense "can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(A)(i) and 12(b)(3)(B)(v). "A motion to dismiss is generally capable of determination before trial if it involves questions of law rather than fact." *United States v. Kelly*, 874 F.3d 1037, 1046–47 (9th Cir. 2017) (internal quotations omitted). Where a defendant's "challenges to the indictment are based on legal issues[,]" the court "may resolve the issues . . . without intruding upon the province of the ultimate finder of fact." *Id.* (internal quotations omitted). "On a motion to dismiss an indictment for failure to state an offense, the court must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).

## ARGUMENT

### I. SIP violations are only criminally enforceable under Section 7413(c)(1).

This case is about alleged SIP violations.[11] The Clean Air Act provides four, and only four, options for direct federal enforcement in the event of a SIP violation. All four require that EPA first "notify the person and the State." 42 U.S.C. § 7413(a)(1); *see also id.* 7413(c)(1). The first three options are found in Section 7413(a)(1). Once 30 days

SIP can go into effect, EPA also makes sure that it complies with specific requirements that the Clean Air Act imposes for SIPs.").

[11] Indict. ¶¶ 7–20 (describing California's SIP smog inspection requirements), 21–24 (describing how OBD simulators are allegedly used by some to generate false smog test results, which were transmitted to California), 25, 38–65, 75 (attributing this conduct to Mr. Hemdan and others).

have passed from EPA's notice, EPA can either (i) issue a compliance order; (ii) issue an administrative penalty; or (iii) bring a civil action.

The fourth option is criminal enforcement under Section 7413(c)(1). It is available where violative conduct persists "more than 30 days" after notice is received under subsection (a)(1),[12] and where the conduct is done "knowingly." 42 U.S.C. § 7413(c)(1). *See Adamo Wrecking Co. v. United States*, 434 U.S. 275, 282 (1978) ("[Congress] has in § 113(c)(1)(A) provided criminal penalties for violations of those plans, [and] it has nonetheless required, under normal circumstances, that a violation continue for a period of 30 days after receipt of notice of the violation from the Administrator before the criminal sanction may be imposed."); *United States v. Gen. Motors Corp.*, 876 F.2d 1060, 1064 (1st Cir. 1989), *aff'd*, 496 U.S. 530 (1990) ("EPA issued a Notice of Violation to GM concerning violations of the existing SIP by the company's lacquer plant—*a prerequisite to the bringing of an enforcement action*.") (emphasis added).[13]

This notice requirement has a dual function. First, it makes alleged violators aware that their conduct is unlawful and provides them the opportunity to correct themselves before being subject to a regulatory felony.[14] Second, it provides the state with an initial opportunity "to act to enforce its own implementation plan before the EPA steps in."

---

[12] The government can also criminally charge a SIP violator without notice if the violation occurred during a period of federally assumed enforcement, as described in 42 U.S.C. § 7413(a)(2).

[13] The courts in *Adamo Wrecking Co.* and *Gen. Motor Corp.* were interpreting a pre-1990 version of this section, but the notice and cure provisions remained materially the same. *See* Appendix A (redline of pre-1990 text of Section 7413 with current statutory text).

[14] "The Code of Federal Regulations contains over 48,000 sections, stretching over 175,000 pages—far more than any citizen can possibly read, let alone fully understand. Worse, many carry potential criminal penalties for violations. The situation has become so dire that no one—likely including those charged with enforcing our criminal laws at the Department of Justice—knows how many separate criminal offenses are contained in the Code of Federal Regulations, with at least one source estimating hundreds of thousands of such crimes." Exec. Order No. 14,294, 90 Fed. Reg. 20363 (May 9, 2025).

*United States v. B & W Inv. Props.*, 38 F.3d 362, 366–67 (7th Cir. 1994). This approach is "consistent with the overall goals of the Clean Air Act and its 1970 Amendments, which increased the federal government's role in air quality control while preserving the locus of primary responsibility within state and local governments." *Id.*

Count Two does not follow any of these four options. Rather, it attempts to charge a SIP violation under a general provision about recordkeeping and reporting (42 U.S.C. § 7413(c)(2)(A))—a provision that lacks a notice and 30-day requirement. *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1051 (N.D. Ind. 2001) ("CAA claims not involving SIPs do not trigger the notice requirement."). The government's theory seems to assume that Section 7413(c)(2)(A) offers a fifth option for SIP enforcement by virtue of its parenthetical ("whether with respect to the requirements imposed by the Administrator or by a State"), but without the SIP enforcement prerequisites. This is incorrect. As shown below, the Clean Air Act's language, structure, and legislative history require that Section 7413(a)(1) be the exclusive vehicle for criminal enforcement of SIP violations.

### A. Statutory Text

Starting with the statutory text, there are at least two reasons SIP violations must be charged under Section 7413(c)(1) and not Section 7413(c)(2)(A).

**First**, Section 7413(c)(1) uses the Clean Air Act's defined term for a SIP—"applicable implementation plan"—whereas Section 7413(c)(2)(A) does not. *See* 42 U.S.C. § 7602(q) (listing "applicable implementation plan" as the defined term for a SIP). In accordance with the defined term, Congress has always referred to SIPs using the term "applicable implementation plan," occasionally shortened to "implementation plan."[15] *See*

[15] *See* 42 U.S.C. §§ 7405(a), 7406, 7407(a), (b), (d), 7410(a), (c), (f)–(i), (k)–(o), 7411(d), 7413(a)–(d), 7414(a), (d), 7415(b), 7416, 7419(a), (b), 7420(a), 7421, 7422(c), 7423(a), 7424(a), 7425(a), (b), (d),

*also Oklahoma v. EPA*, 605 U.S. 609, 620 (2025) ("A SIP is an 'implementation plan under section 7410 . . . ,"); *Envtl. Def. v. EPA*, 467 F.3d 1329, 1331 (D.C. Cir. 2006) ("SIPs, which are sometimes also referred to in the statutes and regulations as 'implementation plans . . . ."). There is no example in the Act of Congress calling a SIP anything else.

Congress used the defined term "applicable implementation plan" in Section 7413(c)(1). It did not use that term in Section 7413(c)(2)(A). Having the precise term at hand and having just used it, Congress would not have re-described the same category far less precisely, a few lines later, using a disjunction that does not fit.[16] "[I]f Congress had wanted to" include SIP recordkeeping/reporting violations within the scope of Section 7413(c)(2)(A), "it would simply have said so." *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 440 (2022).

So what does the parenthetical mean in Section 7413(c)(2)(A)? It clarifies that Section 7413(c)(2)(A) applies to both types of reporting requirements imposed primarily under the next section of the Act—Section 7414. Section 7414 contains the Act's general authorization to impose reporting and recordkeeping requirements, which can be imposed

---

(f), 7426(a), (c), 7428(a), 7429(h), 7470(4), 7471, 7473(a), 7476(e), 7477, 7478(a), 7491(b), (d), 7492(e), 7501(3), 7502(a), 7503(a), (b), 7504(a), (b), 7505a(a), (b), (d), 7506(c), 7506a(c), 7509(a), (d), 7509a(a), 7511(a), 7511a(a)–(e), (g), (j), 7511b(h), 7511c(b), (c), 7511d(a), (b), (d), 7512(a), 7512a(a), (b), (e), 7513(d), (e), 7513a(a), (b), 7514(a), (b), 7514a(a)–(c), 7521(i), (m), 7545(c), (m), (t), 7586(a), 7589(c), (f), 7590(a), 7601(d), 7602(n), (o), (q), (y), 7604(f), 7607(b), (d), 7616(b), 7619(a), 7621(a), 7622(a), 7625(b), 7625-1(b), 7626(b), 7651b(f), 7651c(e), 7651h(c), 7651n(b), 7661(3), 7661a(b), 7661c(a), 7661d(b), 7661f(a).

[16] Section 7413(c)(2)(A)'s use of the word "or" in its parenthetical—"whether with respect to the requirements imposed by the Administrator *or* by a State"—is in tension with the characteristics of a SIP. A SIP's requirements are imposed by EPA *and* by a state, not "or." The State proposes and adopts the measure, but the measure becomes operative federal law only upon EPA's approval, and then the State and EPA share responsibility for its enforcement. *Commonwealth of Virginia v. E.P.A.*, 108 F.3d 1397, 1408 (D.C. Cir. 1997) (quoting *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036–37 (7th Cir. 1984)) ("[T]he Clean Air Act creates a partnership between the states and the federal government. The state proposes, the EPA disposes.").

either directly by EPA or delegated to a state. The Supreme Court has made clear these are separate from SIP requirements (which come primarily from Section 7410):

> Congress naturally treated the submission of federal installations to state regulation under §§ 111, 112, and 114 [section 7414] separately from general provisions for meeting ambient air quality standards under § 110 implementation plans devised by the States and approved by the EPA [i.e., SIPs]. A State must promulgate an implementation plan. § 110(a). The delegation provisions of §§ 111, 112, and 114 [section 7414], on the other hand, are permissive, providing that "(e)ach State may develop and submit to the Administrator a procedure" to carry out the section.

*Hancock v. Train*, 426 U.S. 167, 192 (1976). The government's charging theory scrambles these distinct concepts, reading SIPs into an unrelated parenthetical that does not include the defined term for SIPs.

**Second**, "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (internal quotations omitted). "That is particularly true where . . . Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id.* (internal quotations omitted); *see also Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 930 (9th Cir. 1986) ("Fundamental maxims of statutory construction require that a specific statutory section qualifies a more general section and will govern, even though the general provisions, standing alone, would encompass the same subject.").

Here, the only Clean Air Act provision that provides for criminal enforcement of a SIP violation is Section 7413(c)(1). It permits criminal charges for the violation of "any requirement or prohibition of an applicable implementation plan" (i.e., a SIP). Whereas Section 7413(c)(2)(A) says nothing of SIPs, but rather refers to false statements made in records "required pursuant to this chapter to be either filed or maintained," which again

primarily describes Section 7414 recordkeeping/reporting requirements. Even assuming Congress expanded its glossary for SIPs in Section 7413(c)(2)(A) with language "broad enough to include" the same conduct as Section 7413(c)(1), it ought "not be held to apply to a matter specifically dealt with in another part of the same enactment." *RadLAX Gateway Hotel*, 566 U.S. at 646 (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). Rather, the "terms of the specific authorization must be complied with." *Id.* at 645. Thus, because Section 7413(c)(1) specifically provides for criminal SIP enforcement, Section 7413(c)(1) is the applicable section for the conduct charged.[17]

### B. Structure

The government's charging theory creates at least two structural problems within Section 7413.

**First**, it renders Section 7413(c)(1)'s notice requirement optional for any record-keeping violation of a SIP, allowing the government to skip Section 7413(c)(1)'s notice rules and simply bring charges under Section 7413(c)(2)(A). This makes little sense. SIP violations can be quite serious, such as stationary sources (i.e., fossil fuel power plants, incinerators, and blast furnaces) emitting high levels of pollution into the environment in real time.[18] So, while the hazardous polluter gets notice and 30 days to stop polluting before they can be charged, the *recordkeeper* can be an immediate felon the first time he does it, with no notice or opportunity to cure required, if the government is permitted to charge under Section 7413(c)(2)(A) instead of Section 7413(c)(1).

---

[17] *Cf. Geltman Indus.*, 784 F.2d at 930 ("[W]hile § 1405(b) specifically mentions insolvency liquidations, § 1405(a) makes no such reference. Therefore, if an employer is insolvent, the provisions of § 1405(b) apply. If the employer is not insolvent, and the other conditions of § 1405(a) are met, the provisions of that section apply.").

[18] *E.g., United States v. SCM Corp.*, 667 F. Supp. 1110, 1116–17 (D. Md. 1987); *BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1048.

**Second**, to even bring an *administrative* or *civil* action against SIP recordkeeping/reporting violators, EPA must still provide notice and a 30-day waiting period. 42 U.S.C. § 7413(a). It makes no sense that Congress implicitly exempted *criminal* prosecution from the same requirements.[19]

### C. Legislative History

Congress has stood firm on Section 7413(c)(1)'s limitations on SIP enforcement, even in the face of pushback from EPA on these exact issues. In 1989, Congress entered into the Congressional Record a section-by-section analysis of EPA's proposals for amendments to the Act.[20] EPA sought to remove the notice requirement by adding the following language to Section 7413(a): "Nothing in this subsection shall preclude the United States from commencing a criminal action under section 113(c) *without such notification for any such violation*."[21] EPA further proposed in Section 7413(a)(3) that the agency be authorized to "ask the Attorney General to commence a criminal action in accordance with subsection (c)" for "any other requirement of title I,"[22] which would include SIP violations. EPA also proposed that Section 7413(c)(1) be struck *in its entirety*.[23] The basis for these proposed changes was

> to clarify and confirm that the 30-day notice period is not a shield to protect sources. Subsection 113(a)(1) is amended to clarify and

---

[19] There is one case from 1995 where the District of Colorado upheld a charge for a SIP violation under Section 7413(a)(2)(A). *United States v. Louisiana Pacific Corp.*, 908 F. Supp. 835, 838, 843 (D. Colo. 1995). But there, the court did not consider whether Section 7413(a)(2)(A) was an appropriate avenue to enforce a SIP violation because the issue was not raised.

[20] U.S. Envtl. Prot. Agency, *Section-by-Section Analysis of the "Clean Air Act Amendments of 1989* (July 20, 1989), available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=90060800.PDF ("EPA Section-by-Section Analysis"); *see also* Appendix B (a redline comparing the pre-1990 text of Section 7413 and the EPA's proposed changes).

[21] S. 1490, § 601(b) (101st Cong., 1st Sess., 1989) (emphasis added); *see* Appendix B at p. 1.

[22] S. 1490, § 601(d) (101st Cong., 1st Sess., 1989); *see* Appendix B at pp. 1–2.

[23] S. 1490, § 601(h) (101st Cong., 1st Sess., 1989); *see* Appendix B at p. 3.

> confirm that the 30-day notice provision is intended solely to allow the states an opportunity to exercise their civil enforcement prerogatives before Federal enforcement action is initiated . . . Amendments to subsection 113(a) clarify and confirm that the 30-day notice provision for civil and administrative SIP actions is inapplicable to criminal actions.[24]

Congress said no to each of these changes. Not only that, it *added* language under Section 7413(a)(3) clarifying that EPA *cannot* make criminal referrals of SIP violations to the Attorney General unless there was notice and the conduct fell within 42 U.S.C. § 7413(c)(1)'s criminal provision.[25] Yet here, the government charged this case as though EPA got its way, asking this Court to eliminate the 30-day notice requirement for conduct falling under Section 7413(c)(1)—even after Congress refused to do that.

### II. The indictment also fails to identify any "notice, application, record, report, plan, or other document required pursuant to this chapter to be either filed or maintained."

The indictment's attempt to charge a SIP violation under Section 7413(c)(2)(A) fails for another reason: the indictment does not identify any "notice, application, record, report, plan, or other document *required pursuant to this chapter* to be either filed or maintained." (emphasis added).

The indictment appears to assert two recordkeeping/reporting violations against Mr. Hemdan. The first is the transmission of data from a smog technician's data acquisition device to BAR's database. (Indict. ¶¶ 13, 16.) The theory appears to be that this data is "required . . . to be filed." The second is a Smog Check Vehicle Inspection Report ("VIR") that BAR generates in response to this data.[26] (Indict. ¶¶ 18–19.) This

---

[24] EPA Section-by-Section Analysis, at 60.

[25] Specifically, 42 U.S.C. § 7413(a)(3) provides that, for violations *other than violations of "a requirement or prohibition enforceable under the preceding provisions of this subsection*," (emphasis added) which includes non-criminal SIP violations under 42 U.S.C. § 7413(a)(1).

[26] The indictment's theory of liability as to the VIR is that Mr. Hemdan can be charged as a principal

theory appears to be that VIRs are "required . . . to be maintained," since California law requires certain reports to be maintained by the smog station for three years. But neither of these "reports" are "required *pursuant to this chapter* to be either filed or maintained."

The Clean Air Act describes three different types of recordkeeping/reporting requirements—(1) Section 7414 requirements; (2) specific, more discrete requirements; and (3) SIP requirements. None of these three categories are the source of either of the two "requirements" alleged in the indictment.

**Section 7414 requirements**. As described above, Section 7414 is Title I's main recordkeeping/reporting provision. EPA is authorized under Section 7414(a)(1) to impose recordkeeping and reporting requirements on certain enumerated persons regulated by the Clean Air Act, including by requiring these persons "on a one-time, periodic, or continuous basis to . . . establish and maintain such reports; make such reports . . . keep records on control equipment parameters . . . submit compliance certifications; and provide such other information as the Administrator may reasonably require . . ." 42 U.S.C. § 7414(a)(1). States can propose to EPA procedures for carrying out Section 7414 and, if EPA finds the proposed procedure adequate, EPA "may delegate to such State any authority he has to carry out this section." 42 U.S.C. § 7414(b)(1).

Said differently, Section 7414 sets up a unique dynamic permitting EPA to delegate to the states its authority to impose these recordkeeping/reporting requirements. *These* reporting requirements are the "notice[s], application[s], record[s], report[s], plan[s], or other document[s] *required pursuant to this chapter* to be either filed or maintained" (emphasis added) as described in Section 7413(c)(2)(A). And it is *this delegation*

under 18 U.S.C. § 2, even though BAR, and not Mr. Hemdan, generated the report.

*authority* that is clarified by the parenthetical language—"whether with respect to the requirements imposed by the Administrator or by a State." Section 7414's reporting requirements are distinct from SIP reporting requirements[27] and are only exercised either by (1) EPA regulation or (2) EPA delegation of authority to a state after (i) an affirmative finding that a state submission defining the procedure by which it will carry out Section 7414 in that state is adequate[28] and (ii) deciding to approve it under Section 7414.[29]

None of that occurred here with respect to the recordkeeping/reporting requirements raised in the indictment. EPA has not reported delegating its recordkeeping/reporting authority to California, nor were these specific provisions enacted pursuant to Section 7414 authority. Therefore, Section 7414 is not a hook for "pursuant to this chapter" here.

**Specific reporting requirements**. In addition to EPA's general recordkeeping/reporting authority, Congress also tasked EPA with implementing certain specific requirements,[30] some of which also can be delegated to the states based on the

---

27 *See Hancock*, 426 U.S. at 192.

28 EPA's Delegation of Its Authority Under Clean Air Act § 113(b) To Enforce New Source Performance Standards and National Emission Standards For Hazardous Air Pollutants, 1988 WL 252387, at *1 (in commenting on the same delegation language in the context of different provisions, EPA explained that "[b]y their own terms, these provisions do not grant enforcement authority to a state, but instead require an *affirmative finding* by the Administrator as a *condition precedent* for delegation") (emphasis added).

29 Even upon an adequacy finding, the delegation provisions are permissive, and EPA may opt to not delegate its authority under Section 7414.

30 *See, e.g.*, 42 U.S.C. §§ 7412(r)(7)(B)(iii) ("The owner or operator of each stationary source covered by clause (ii) shall register a risk management plan . . ."), 7414(a)(3) ("The Administrator shall in the case of any person which is the owner or operator of a major stationary source, and may, in the case of any other person, require enhanced monitoring and submission of compliance certifications."), 7429(c) ("The Administrator shall . . . promulgate regulations requiring the owner or operator of each solid waste incineration unit . . . to report the results of such monitoring."), 7419(b) ("Such interim requirements shall include a requirement that the source to which the order applies comply with such reporting requirements and conduct such monitoring as the Administrator determines may be necessary . . .").

same procedure discussed in the context of Section 7414.[31] These too would be subject to Section 7413(c)(2)(A). *See, e.g.*, *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 300 (3d Cir. 2013) (recognizing Section 7413(c)(2)(A) as the criminal enforcement provisions for submitting deficient Title V permit applications). On their own terms, none of those apply here.

**SIP recordkeeping/reporting requirements.** The final type of recordkeeping/reporting requirements appear in Congress's SIP provisions, defining the required parameters for SIPs.[32] Notably, any SIP-related reporting requirements in the Act are imposed on EPA, the state, or a stationary source operator.[33] And, with one exception for states,[34] *none* of these SIP-related recordkeeping/reporting requirements apply to a state's vehicle inspection and maintenance ("I/M") program. There is no such requirement placed on a private actor—including a state-licensed smog technician, like Mr. Hemdan—to report, record, file, or maintain *anything* in connection with an I/M program. Here, California's decision to include reporting and maintaining obligations as part of its licensing system—which ended up in its approved SIP—was not done "pursuant to this chapter" but rather, pursuant to the California legislature's independent decision to impose *additional* requirements, beyond the Clean Air Act. These additional requirements were not "required pursuant to" the Clean Air Act.

---

[31] *E.g.*, 42 U.S.C. § 7412(l).

[32] *E.g.*, 42 U.S.C. § 7410(a)(F)(ii)-(iii) (each SIP "shall" "require, as may be prescribed by the Administrator . . . periodic reports on the nature and amounts of emissions and emissions-related data from [stationary] sources, and correlation of such reports by the State agency.")

[33] *See, e.g.*, 42 U.S.C. § 7410(a)(2)(B), (a)(2)(F)(ii)–(iii), (a)(2)(K)(ii), (h)(1), 7511a(a)(1), (a)(3)(B)(i), (c)(5)(A), (g)(2).

[34] Specifically, in certain areas classified as "serious" or worse, states are required to prepare a biennial report to EPA regarding the effectiveness of the enhanced I/M program in that area. 42 U.S.C. § 7511a(c)(3)(C).

The government cannot use Section 7413(c)(2)(A)'s parenthetical to import SIP requirements into that provision, *especially* requirements that are not otherwise required under the Clean Air Act. Again, this parenthetical is merely clarifying that Section 7413(c)(2)(A) reaches both requirements imposed by EPA and, if delegated to a state under Section 7414 (or the other more discrete recordkeeping/reporting requirements mentioned in category two), then also the state. It does not displace the statute's independent command that the record be one "required pursuant to this chapter to be either filed or maintained." The question is whether the *Clean Air Act* is the source of the duty, and on that question the parenthetical is silent.

Aggressively reading the parenthetical to import requirements that are not required by the Clean Air Act but that were products of a state's independent judgment effectively erases the element that such a report be "required *pursuant to this chapter* to be either filed or maintained." The Clean Air Act *must* be the source of the required report or record if this language is to have any meaning. The parenthetical clarifies that it does not matter whether these statutory requirements are carried out by EPA or by the state. *Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. at 440 ("[A] parenthetical is typically used to convey an aside or afterthought.") (internal quotations omitted). Congress did not establish a regime through a parenthetical that would effectively import any recordkeeping/reporting requirement that a state fancies into the Clean Air Act's felony enforcement provisions. *See id.* ("If Congress does not alter the fundamental[s] of a statutory scheme in vague terms or ancillary provisions, then it ordinarily does not do so in parentheticals either.") (internal quotations omitted).

### III. The government's legal theory violates Mr. Hemdan's due process right to fair notice and the rule of lenity.

Even if permissible under the statute (it is not), the indictment's legal theory should be rejected under the right to fair notice and the rule of lenity.

**First**, "[t]he Government violates [the guarantee of due process] by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)). Thus, "[p]enal statutes are construed narrowly to insure (sic) that no individual is convicted unless a fair warning has first been given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 375 (1973) (internal quotations and brackets omitted).

"The CAA was, and indisputably remains, the most complex of the environmental statutes administered by the Agency," such that a "detailed understanding of the CAA regulatory schemes may only be required in the context of specific investigations."[35] *See also Nw. Env't Def. Ctr. v. Owens Corning Corp.*, 434 F. Supp. 2d 957, 961 (D. Or. 2006) ("The Clean Air Act has been described as without a doubt the most complex environmental regulatory scheme, one that is bewildering at times to even the most experienced environmental lawyers.") (internal quotations omitted). Under complex schemes like this one, "regulated parties should know what is required of them so they may act accordingly," and "precision and guidance are necessary so that those enforcing

[35] *Hughes Memo*, *supra* note 1, at 1.

the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Here, Congress built fair notice into the process for charging SIP violations under Section 7413(c)(1). This notice requirement "ensures fairness, makes deterrence possible, and avoids *ex post facto* application of criminal prohibitions." *United States v. Trimble*, 487 F.3d 752, 756–57 (9th Cir. 2007) (internal citations and parentheticals omitted). But "[t]elling an alleged offender after the fact what the punishment will be if he is convicted serves none of these purposes." *Id.* So, too, does telling an alleged offender that he receives none of these protections because his case involves recordkeeping.

To add to the complexity and due process concerns, as of 2022, California law prohibits OBD simulators in testing areas, but this update has not been approved for California's SIP.[36] Not only is this limitation not part of California's SIP, but it was not in place at the time of Mr. Hemdan's alleged conduct in 2019.[37] Yet, despite both these facts, the indictment attempts to federally prosecute use of OBD simulators in a licensing station (i) as SIP violations by describing what an OBD simulator does in terms intended to implicate the Act's general recordkeeping/reporting provision;[38] and (ii) for conduct that occurred in 2019, when California did not even prohibit OBD simulators in smog stations.

***Second***, to the extent the Court finds there to be ambiguity with respect to whether Section 7413(c)(2)(A) applies to SIP violations, this Court should apply the rule of lenity to interpret this provision narrowly. The rule of lenity, which provides that "statutes

---

[36] *See supra* note 10.

[37] Indict. p. 19 (Count Two).

[38] Indict. ¶¶ 15–19, 21–24 (describing the electronic transmission of data from OBD simulators to BAR and casting that as a theory of false reporting under the Clean Air Act).

imposing penalties are to be 'construed strictly' against the government and in favor of individuals," exists, in part, to protect against due process violations like the "serious fair-notice problem[s]" here. *See Bittner v. United States*, 598 U.S. 85, 101–102 (2023). It "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997); *see also United States v. Santos*, 553 U.S. 507, 514 (2008).

Furthermore, there is an elephant in the room that strengthens the case for lenity. That is, there are mixed signals regarding whether Title I's enforcement provisions are intended to reach mobile-source violations *at all*. Congress primarily dealt with mobile-source related conduct in Title II, and stationary-source related conduct in Title I.[39] The I/M provisions are the exception to that divide, likely because they are components of SIPs, which are found in Title I (and primarily pertain to stationary source regulation and have little to say about mobile sources). But in substance, I/M requirements—like the ones at issue here—are mobile-source regulations, and mobile-source regulations are treated very differently in the Clean Air Act from stationary-source regulations.[40]

Historically, mobile-source related conduct has not been subject to criminal enforcement under Section 7413. For almost 30 years since its enactment, Section 7413 was only believed to criminalize stationary-source related conduct in Title I. This is because Title I and Title II have separate enforcement provisions, and Title II only

---

[39] *See Stauffer Chem. Co.*, 684 F.2d at 1183; *Weiler,* 392 F.3d at 534 ("Broadly speaking, Title I of the statute regulates stationary sources of pollution and Title II regulates mobile sources, most importantly motor vehicles.") (quoting *Sierra Club v. Larson*, 2 F.3d 462, 463 (1st Cir. 1993)).

[40] Titles I and II have separate provisions for the establishment of emissions and performance standards (*compare* 42 U.S.C. § 7411 and 42 U.S.C. § 7412, *with* 42 U.S.C. § 7521), recordkeeping and reporting (*compare* 42 U.S.C. § 7414, *with* 42 U.S.C. § 7542), and enforcement (*compare* 42 U.S.C. § 7413(b) (imposing civil penalties under Title I), and § 7413(c) (imposing criminal penalties under Title I), *with* 42 U.S.C. § 7524 (imposing civil penalties under Title II)).

imposes civil penalties. *Compare* 42 U.S.C. § 7413(b)–(c) *with* § 7424. It wasn't until primarily around 2020—after most of the conduct alleged in the indictment had already occurred[41]—that the government started reaching into Title I to prosecute Title II conduct.

For example, in 1993, the Acting Director of EPA's Criminal Enforcement Counsel Division noted in guidance about the criminal enforcement of the 1990 Clean Air Act amendments: "Automobile dealer or repair shop tampering with automotive air emission systems *still cannot be prosecuted criminally under the CAA* since the mobile source regulations impose various compliance certification responsibilities only on automobile manufacturers and not on the dealers."[42] These types of public statements and enforcement history aligned with what environmental scholars were saying as well.[43]

These interpretations of the Act were also consistent with its legislative history. When it was amended in 1977, the House reported that stationary source violations could be criminally charged whereas mobile source violations were civil offenses:

> The mobile source enforcement provisions (sections 203–5 of the act) authorized the Administrator to seek injunctive relief and/or judicially imposed civil penalties. However, *no criminal sanctions were provided for violation of mobile source-related regulations*. On the other hand, the stationary source enforcement provisions (section 113 of the act) authorized injunctive relief and the imposition of criminal penalties.

---

41 Indict. ¶ 38 & p. 18 (for Count One, the alleged conduct took place from October 30, 2015 to March 2024; for Count Two, the alleged conduct took place in 2019).

42 *Hughes Memo*, *supra* note 1, at 6 (emphasis added).

43 *E.g.*, David Currie, The Mobile-Source Provisions of the Clean Air Act, 46 U. Chi. L. Rev. 811, 872 n.383 (1979) ("The enforcement provisions of section 113 [i.e., Section 7413], including administrative orders and criminal sanctions, do not apply to motor-vehicle violations.").

H.R. Rep. No. 95-294, at 69 (1977) (emphasis added). When the Act was amended again in 1990, no one saw any of these amendments as expanding Section 7413 to now include Title II mobile source violations, including EPA and ENRD officials.[44]

This was the status quo until roughly 2020, when the government suddenly began bringing criminal cases for OBD tampering under Title I's criminal enforcement provisions for the first time since the Act's enactment.[45] That is, until the government announced on January 21, 2026, that it would "no longer pursue criminal charges under the Clean Air Act based on allegations of tampering with onboard diagnostic devices in motor vehicles."[46] In an April 3, 2026 filing, DOJ further explained that the reason for this change was based on statutory arguments pertaining to Section 7413(c)(2)(C).[47]

---

[44] *See* James Miskiewicz & John Rudd, *Civil and Criminal Enforcement of the Clean Air Act After the 1990 Amendments*, 9 Pace Envtl. L. Rev. 281, 353 & 353 n.277 (1992) ("[T]he Amendments subject sources to enforcement for violation of 'any' 'requirement or prohibition' of all titles of the Act, except title II concerning mobile sources."); Michael S. Alushin, *Enforcement of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 2217, 2229 (1991) (same); *see also* E. Donald Elliot *et al*., *The Clean Air Act: New Enforcement and Liability Provisions*, 42 J. Air Waste Mgmt. Assoc. 1414, 1415 (1992), *available at* https://www.tandfonline.com/doi/epdf/10.1080/10473289.1992.10467086?needAccess=true (Yale Law School professor and former EPA Assistant Administrator and General Counsel explaining that the 1990 Amendments only extended felony liability to that which was previously subject to a misdemeanor).

[45] *See, e.g.,* U.S. Dep't of Justice, *Water Management Companies Enter into Resolutions, Pay $4.3 Million in Monetary Penalties for Clean Air Act Violations* (Sept. 24, 2020), https://www.justice.gov/usao-mdpa/pr/water-management-companies-enter-resolutions-pay-43-million-monetary-penalties-clean; U.S. Dep't of Justice, *Oklahoma City Business Owner Pleads Guilty to Violating the Clean Air Act by Tampering with the Emissions Control Systems on Heavy Duty Diesel Trucks* (Oct. 7, 2021), https://www.justice.gov/usao-wdok/pr/oklahoma-city-business-owner-pleads-guilty-violating-clean-air-act-tampering-emissions; *see also* U.S. Envtl. Prot. Agency, EPA-300-F-20-001, *Enforcement Alert: Aftermarket Defeat Devices and Tampering are Illegal and Undermine Vehicle Emissions Controls*, at 4–5 (2020).

[46] DOJ Env't & Nat. Res. Div. (@DOJEnvironment), X (Jan. 21, 2026, 4:47 PM), https://x.com/DOJEnvironment/status/2014092628753551729.

[47] United States' Opposition to Defendants' Joint Motion for Attorneys' Fees and Litigation Expenses at 3, *United States v. Owens*, No. 2:24-cr-00140-TOR, ECF No. 226 (E.D. Wash. Apr. 3, 2026) ("[T]he Department of Justice changed its policy on charging and prosecuting individuals for criminal violations under 42 U.S.C. § 7413(c)(2)(C) of the Clean Air Act that are based exclusively on tampering with or rendering inaccurate onboard diagnostic devices under a 'required to be maintained' theory, resulting in the dismissal of these charges."). The "required to be maintained" theory referenced by DOJ is one that the undersigned *pro hac vice* counsel presented to the Ninth Circuit in favor of reversing the conviction of Tracy Coiteux for OBD tampering. Appellant's Opening Brief, *United States v. Coiteux*, No. 24-6945, ECF No.

The government's criminal indictment against Mr. Hemdan based on a companion provision in the same section raises similar concerns about the improper criminal targeting of mobile-source-related conduct. To be sure, the conduct at issue here as alleged would fall under Title I as opposed to Title II, where most mobile source regulations live. But this appears to have been an organizational decision by Congress, not necessarily with the intent to subject a small fraction of mobile source-related violations (for which there are no certification responsibilities, unlike many of the mobile source requirements in Title II) Title I's criminal penalties. For example, it does not line up that Congress subjected *emissions tampering or manufacturing/selling equipment for the purpose of emissions tampering* to only civil penalties in Title II,[48] which are capped at $2,500 per vehicle for non-manufacturers and non-dealers,[49] while simultaneously subjecting recordkeeping/reporting violations related to I/M programs to *imprisonment* and a fine pursuant to Title 18, capped *at $250,000*.[50] That result makes no sense.

But whether this was incidental or not, it only increases the notice concerns at issue here, particularly given the fact that this nuance has not previously been litigated, and there is no case law clearing up this otherwise gray picture. Mr. Hemdan should not have to become a specialist in environmental law to predict that—despite the

---

14, at 21–29 (9th Cir. July 9, 2025). After filing our opening brief, the government publicly announced this change in policy and voluntarily moved to dismiss all counts, and Tracy's conviction was dismissed with prejudice. *See* Appellee's Unopposed Motion to Vacate Judgment and Remand for Dismissal, *United States v. Coiteux*, No. 24-6945, ECF No. 37 (9th Cir. Jan. 22, 2026); Ninth Circuit Order Granting Motion in Part and Remanding to District Court, *United States v. Coiteux*, No. 24-6945, ECF No. 38 (9th Cir. Feb. 27, 2026); District Court Order Dismissing Tracy Coiteux with Prejudice, *United States v. Coiteux, et al.*, No. 3:21-cr-05184-BHS, ECF No. 255 (W.D. Wash. March 2, 2026).

[48] 42 U.S.C. § 7522(a)(3)(A).

[49] 42 U.S.C. §§ 7524(a); *cf.* 40 C.F.R. § 19.4 (inflation adjustments).

[50] 18 U.S.C. § 3571(b)(3).

government's public statements to the contrary—there could be an exception buried within the hundreds of pages of statutory text, cross referenced against California's SIP provisions, that could make him a felon. *But see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. New York State Dep't of Env't Conservation*, 17 F.3d 521, 525 (2d Cir. 1994) ("Congress, [United States] *amicus* informs us, took what was widely perceived as an 'unapproachable piece of legislation' and tripled the Act's length and 'geometrically increased its complexity.' After reviewing the Clean Air Act and the voluminous record pertaining to the Act submitted on this appeal, we have no reason to doubt the validity of the government's description of it."). This only strengthens the case for lenity.

## IV. Because the conduct alleged does not constitute a violation of any federal statute, the conspiracy charge must also be dismissed.

The federal conspiracy statute criminalizes conspiring to "commit any offense against the United States." 18 U.S.C. § 371. The indictment fails to state any offense against the United States, let alone one under the Clean Air Act. Therefore, Count One's conspiracy charge must be dismissed. *United States v. Cogswell*, 637 F. Supp. 295, 299 (N.D. Cal. 1985) ("As to the conspiracy to conceal material facts, because the conduct alleged does not constitute a violation of the substantive statute, the alleged agreement to do the act cannot constitute a conspiracy to violate that statute.").

## V. Count II must be dismissed for improper venue under *Abouammo*.

If the Court does not agree with Mr. Hemdan's prior points, Count Two must be dismissed for the alternative reason that the government brought this charge in the wrong court. The Constitution guarantees a defendant the right to trial in the district where the crime was committed. U.S. Const. Art. III, § 2, cl. 3; amend. VI. The Supreme Court recently explained:

> To implement that constitutional rule—meaning, to decide where the crime was committed—courts generally must determine the location of the offense's "essential conduct elements." A court, that is, must initially identify the conduct constituting the offense—the things a defendant must do to violate the statute at issue. And then the court must ascertain the "location" of those "criminal acts"—the place where their "commission" occurred.

*Abouammo v. United States*, 146 S. Ct. 1571, 1576–77 (2026) (internal quotation marks and citations omitted).[51]

The essential elements of a substantive violation of Section 7413(c)(2)(A) are that the accused (1) knowingly; (2) made a false statement or representation or omission; (3) that was material; (4) in any record or report "required pursuant to [the Clean Air Act] to be either filed or maintained." *All* of the conduct alleged in the complaint pertaining to this Count against Mr. Hemdan occurred in the Central District of California. His residence and the location of any smog station he is alleged to have owned or controlled—and where any supposed false statements are alleged to have been made—are in Hawthorne, California, in the Central District. (Indict. ¶ 25.) *Abouammo*, 146 S. Ct. at 1577 ("Because the only proscribed conduct is falsification, venue must be where falsification occurred.").

The indictment's only "hook" for the Eastern District of California in connection with Count Two is that "BAR's centralized servers, which received these electronic transmissions, were located in Rancho Cordova in the Eastern District of California." (Indict. ¶ 17.) But the Supreme Court recently rejected the notion that venue may be had in a district where "no 'conduct constituting the offense' happened." *Abouammo*, 146 S. Ct. at 1579 (2026). In *Abouammo*, the defendant was charged under 18 U.S.C. § 1519,

---

[51] "When a defendant has been indicted on multiple counts, venue must be proper for each count." *United States v. Pace*, 314 F.3d 344, 349 (9th Cir. 2002); *see also United States v. Corona*, 34 F.3d 876, 879 (9th Cir. 1994) ("The court must conduct a separate venue analysis for the substantive crimes and the conspiracy, even if the substantive crimes are committed in furtherance of the conspiracy.").

which "makes it a crime to knowingly falsify a document with the intent to obstruct a federal investigation." 146 S. Ct. at 1575. There, the defendant falsified the document in Seattle but was indicted in the Northern District of California under the theory that the investigation (i.e., the subject of the obstruction under the statute) was in San Francisco. *Id.* The Ninth Circuit upheld venue on the basis that the "contemplated effects" of the falsification was part of the offense, and those effects reached San Francisco. *Id.* at 1576.

The Supreme Court reversed, holding that venue "is, and is only, where the defendant falsified a document, because that is the only conduct proscribed by the statute." *Id.* The Court reasoned that "[t]he only prohibited act in that statute is the falsification of a document. Once a person has committed that act (with the requisite intent), he need do nothing more to violate the law. He need not, for example, transmit the document to anyone else, nor must he use it in any particular way." *Id.* at 1577.

So too here. Section 7413(c)(2)(A)'s plain terms only prohibit the falsification of the document, and nothing more. That these "reports" were electronically transmitted to BAR's servers in the Eastern District have no bearing on whether the elements of the crime have been met, because the requisite conduct as alleged was complete in the Central District. And "it [is] immaterial" whether or not Mr. Hemdan "acted for the purpose of transporting the [report] into another [district]." *Abouammo*, 146 S. Ct. at 1578 (internal quotations omitted). Therefore, Count Two cannot be prosecuted in this Court.

**CONCLUSION**

For the foregoing reasons, the indictment fails to state an offense against Hossam Hemdan and, thus, Counts One and Two should be dismissed with prejudice against Mr. Hemdan. Alternatively, Count Two must be dismissed for improper venue.

**Date**: July 16, 2026

Respectfully Submitted,

*/s/ Alex Bourelly*

Alex Bourelly (admitted *pro hac vice*)
Andrew George (admitted *pro hac vice*)
Bethany Labrinos (admitted *pro hac vice*)
**Bourelly, George + Brodey PLLC**
1050 30th Street NW
Washington, D.C. 20007
(202) 255-2357
(202) 341-8805
(845) 633-4240
alex.bourelly@bgblawyers.com
andrew.george@bgblawyers.com
bethany.labrinos@bgblawyers.com

Marvin E. Vallejo (SBN 269561)
**Law Office of Marvin E. Vallejo**
3250 Wilshire Blvd.
Suite 1110
Los Angeles, CA 90010
(323) 947-8490
marvine.vallejo@gmail.com

*Attorneys for Defendant Hossam Hemdan*